**FONOTAGA SEVA`AETASI, Plaintiff,**

**v.**

**AMERICAN SAMOA POWER AUTHORITY, Defendant.**

High Court of American Samoa
Trial Division
CA No. 123-00

May 14, 2001

Before KRUSE, Chief Justice, and ATIULAGI, Associate Judge.

Counsel: For Plaintiff, William H. Reardon
For Defendant, Roy J.D. Hall, Jr.

## DECISION AND ORDER

Plaintiff Fonotaga Seva`aetasi's ("Seva`aetasi") home and its contents were destroyed by a fire that broke out shortly after the defendant American Samoa Power Authority ("ASPA") had reconnected electrical supply to the premises. ASPA had previously disconnected Seva'aetasi's power because of delinquent utility bills. Seva'aetasi sued, claiming ASPA's negligence as the proximate cause of her loss.

Seva`aetasi's negligence claim is twofold. She argues that the doctrine of *res ipsa loquitur* applies in her case. She reasons that her home's electrical system had been operational problem free for many years until ASPA shut down the power and then reconnected supply. She contends that these surrounding circumstances coupled with the occurrence of the fire shortly after reconnection, must point to some sort of negligence on ASPA's part. "Homes do not ordinarily burn down without someone's negligence." (Pl.'s Summation 2.)

Seva`aetasi's second theory of negligence is based on the claim that ASPA had a duty of care to ensure that all the "breakers were off" before reconnecting power. *Id.*

## 1. *Res Ipsa Loquitur*

■ The doctrine of *res ipsa loquitur* applies "when the accident's nature is such that past experience has shown that it probably resulted from someone's negligence and that the defendant is probably responsible." *Lang v. Am. Samoa Gov't*, 24 A.S.R.2d 59, 61 (Trial Div. 1993). Specifically, the doctrine "applies to an accident only under the following conditions: (1) it ordinarily does not occur without someone's negligence, (2) it was caused by an agency or instrumentality within defendant's exclusive control, and 3) it was not due to a voluntary action by the plaintiff." *Id.* In the final analysis, however, *res ipsa loquitur*, as the Appellate Division explained:

> [I]s no more than one form of circumstantial evidence.... The inference of negligence to be drawn from the circumstances is left to the jury. They are permitted, but not compelled, to find it.

> In other words, the doctrine, when applicable, merely establishes a permissive inference of negligence which the fact finder is not required to adopt.

*Iosia v. Nat'l Pac. Ins. Ltd.*, 20 A.S.R.2d 123, 124-125 (App. Div. 1992) (quoting W. PAGE KEETON ET AL., PROSSER AND KEATON ON THE LAW OF TORTS § 40 (5th ed. 1984)).

■ In the matter at bar, we find the evidence insufficient to sustain the inference of negligence sought by Seva`aetasi. First, while the evidence suggests that the fire had started at that part of the house locating the electrical panel, with ASPA'S meter on the opposite exterior side of the wall, the evidence also showed that there was nothing particularly involved or untoward with the disconnection and reconnection of electrical power supply by ASPA's employee. The connection/ reconnection process simply entailed the removal of the meter (essentially a large male plug) from its outside wall mounted casing (a female receptacle); the attachment of plastic clips over two of the meter's prongs to break the flow of current when reinserted back into the casing; and then reversal of this process to reestablish electrical flow back into the premises. ASPA's employee did nothing out of the ordinary with reconnection such as would demonstrate negligence.

Moreover, the evidence further revealed that ASPA's employee had not put in a new or different meter. Reconnection here involved the very same meter that Sevaaetasi's structure had operated with in the past. This fact runs counter to counsel's opening submission that the fire must

93

be attributable to a faulty meter put in place by ASPA.[1]

A more probable explanation of the fire may be drawn from the testimony of Mr. Fred Niedo, an electrical engineer with the Department of Public Works. Mr. Niedo, who was called as plaintiff's expert witness, explained that the reconnection of power to premises with heavy loads on, such as freezers, dryers, air conditioners, water heaters, etc., will result in a heavy in-rush of current to the electrical system. This in-rush can result in an overload on the system that can in turn generate sufficient heat to destroy the integrity of the wiring insulation, and cause a fire.

However, Mr. Niedo also went on to say that there are, with a properly designed and wired electrical system, a "cascade" of safety features in place to meet overload hazards. These include, a properly fused main safety switch; properly sized wire from the main to the panel board to carry overall load; and on the panel board itself, the right size of fuse, wires, circuits breakers and other components designed or sized to carry the individual loads and the overloads.

The circumstances here suggest that the fire was due in part to a total failure of the safety features that Mr. Hiedo had described as ordinarily expected. How an electrical system is designed and put in place to incorporate these safety features, however, are matters within the consumer's control and not ASPA's. This point was underscored in the evidence showing that the burnt structure was originally a family residence and its electrical system was presumably, therefore, designed for residential purposes. The premises' electrical system was at some subsequent time altered by Seva'aetasi's former husband, Don Hardy, to accommodate a store and business office. While this reconstruction added accordingly to the burden of the electrical system, the alterations to the system were undertaken without the prerequisite permits from the building branch.

Additionally, the fire would have escalated because of action unwittingly taken by a Seva'aetasi family member who initially responded to the fire by throwing a bucket of water at the apparent source of the fire, the panel. Mr. Niedo testified that throwing water on the panel would result in a fire. Clearly, *res ipsa loquitur* is inappropriate under these circumstances.

---

[1] The meter, incidentally, mysteriously went missing. The only evidence of the meter at the scene shortly after the fire were the shattered remains of the meter's glass covering which were found inside the room housing the electrical panel.

## 2. *Prerequisite Duty Of Care*

■ Lastly, Mr. Miedo also testified that the fire could have been avoided if the various load bearing appliances or the various circuit breakers in the premises had been turned off prior to reconnection. To this end, plaintiff's counsel submits that ASPA should have made sure that all the panel breakers were switched off prior to reconnection. (P1.'s Summation 2.) Effectively, counsel is advocating that ASPA had such a duty of care.

No authority was cited for this proposition, and we fail to see a basis for this contention. What, for instance, would be the consequences of a general power outage, a not infrequent occurrence on-island? The logical extension of this sort of argument is the requirement that ASPA would have to go about ensuring that the circuit breakers of every one of its customers are switched off before it can safely restore electrical service without fear of liability. It takes little imagination to picture the impracticality of such a state of affairs. In our view, overload hazards are better met by maintaining the onus with utility consumers to ensure that their safety switches, circuit breakers, wiring, and all other components of their respective electrical systems are adequately designed, sized, and put in place.[2]

We conclude that Seva'aetasi has failed to prove actionable negligence on ASPA's part. Judgment will accordingly enter in favor of the defendant.

It is so ordered.

---

[2] *ASPA's counsel points us to certain regulations, said to have been duly* promulgated under the Administrative Procedures Act, § 4.1001 et seq., ("APA"), purporting to limit ASPA's liability. We were referred to an excerpt from Title 12 A.S.A.C.

The cited regulations, however, were in fact promulgated in 1981 under the Governor's rule making authority, under Section 6, Article IV of the Revised Constitution of American Samoa and not under the APA. See A.S.A.C. § 12.0103. These rules, which were promulgated to, among other things, set up a separate utility entity, have been ostensibly trumped by subsequent legislation enacted in 1982. See A.S.C.A. §§ 15.0101 et seq. This legislation actually empowers the statutory entity ASPA to promulgate rules under APA. See A.S.C.A. § 15.0102(8).

At this time, we merely posit, but do not address, the vitality of the regulations cited to us by counsel.